**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____

SABERT CORPORATION,

        Plaintiff,

        v.

WADDINGTON NORTH AMERICA, INC.,

        Defendant.
_____

Civil Action No. 06-5423 (JAG)

**OPINION**

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on Defendant Waddington North America, Inc.'s ("Defendant" or "Waddington") motion to dismiss Plaintiff Sabert Corporation's ("Plaintiff" or "Sabert") Complaint for lack of subject matter jurisdiction, pursuant to Fed. R. Civ. P. 12(b)(1), or for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), or, in the alternative, to stay or administratively terminate the action pending the outcome of recently initiated reexamination proceedings in the United States Patent and Trademark Office ("PTO"). Defendant also moves to strike the claim for damages in Count Three of the Complaint, pursuant to Loc. R. Civ. P. 8.1. For the reasons stated herein, Defendant's motion to dismiss based on standing is denied, Defendant's motion to stay the action is granted, and Defendant's motion to strike the claim for damages is granted.

1

## BACKGROUND

**I.  The Patent**

Waddington holds, by assignment, Patent No. 6,983,542 (the "'542 Patent"), which issued on January 10, 2006.  (Compl. Ex. A (a copy of the '542 Patent).)  The '542 Patent "relates generally to the production of food-service articles for household, catering[,] and restaurant use[,] including commercial and institutional tableware . . . having a metal appearance."  (Compl. Ex. A at cl. 1, col. 1, ll. 10-16.)  In essence, the patent protects the process of applying an extremely thin layer of metallic substance to plastic cutlery and dinnerware.

As originally issued, the '542 Patent has 37 claims, of which claims 1, 13, 25, and 26 are independent.  Certain claims include specific limitations relating to the thickness of the metal on the cutlery being less than 2000 nanometers.  (Compl. Ex. A at cl. 1, col. 11, ll. 59-65.)  Other claims relate to the use of specific processes by which the metal coating is applied in the appropriate thickness.

**II.  Contact between Sabert and Waddington**

On August 8, 2006, counsel for Sabert, Ezra Sutton ("Sutton") wrote a letter (the "August 8 Letter") to Waddington concerning the '542 Patent.  (Declaration of Roy H. Wepner ("Wepner Decl.") Ex. 1 (a copy of a letter dated August 8, 2006 from Ezra Sutton to Michael Evans, President and Chief Operating Officer of Waddington).)  In the August 8 Letter, Sutton asserted that the '542 Patent claims were invalid because other companies were using the process identified in the '542 Patent one year before it issued.  (Wepner Decl. Ex. 1 at 1.)  Sutton concluded his letter by stating that:

> Once we receive your response to this letter, we shall then decide if it is necessary to supply the enclosed information and documents to the U[nited] S[tates] Patent Office to show that the '542 Patent should not have been granted, and they should take appropriate action to cancel the patent.

(Wepner Decl. Ex. 1 at 3.)

On August 21, 2006, counsel for Waddington responded to the August 8 Letter. (Wepner Decl. Ex. 2 (Letter dated August 21, 2006 from Scott J. Asmus, Esq. to Ezra Sutton).) In its response (the "August 21 Letter"), counsel for Waddington indicated that the information provided by Sutton would be submitted to the PTO in corresponding patent applications. (Wepner Decl. Ex. 2 at 1.) Counsel for Waddington also indicated that it disagreed with the assertion that the '542 Patent was not valid, and requested samples of the prior art asserted by Sabert. The August 21 Letter also indicated that Sabert was free to utilize the technology used to produce the prior art, but that Waddington intended to defend its patented technology. (Wepner Decl. Ex. 2 at 2.) The August 21 Letter concluded with an offer to license the technologies covered in the '542 Patent. (Wepner Decl. Ex. 2 at 2.)

Sabert responded to the August 21 Letter by providing a sample of the new Sabert product. (Wepner Decl. Ex. 3 (Letter dated September 19, 2006 from Ezra Sutton to Scott J. Asmus) at 1). Waddington replied in a letter dated September 25, 2006, indicating that Waddington had received the sample, but that the sample was broken. (Wepner Decl. Ex. 4 (Letter dated September 25, 2006 from Scott J. Asmus to Ezra Sutton).) Waddington requested and was provided a second sample.

On October 12, 2006, Waddington wrote to Sabert requesting further information on the product, in lieu of submitting the sample to be analyzed and indicating that the additional

3

information would help Waddington provide "a definitive answer." (Wepner Decl. Ex. 5 (Letter dated October 12, 2006 from Asmus to Sutton) at 1.) The October 12 Letter reiterated that Waddington would provide written authorization to Sabert to produce metallized food service articles if they utilized only the prior art. The sample provided, Waddington continued, appeared to be stainless steel, as opposed to aluminum, and would, therefore, infringe upon the '542 Patent. (Id. at 2.) The letter concluded by expressing Waddington's interest in continuing a dialogue. (Id.)

Sabert responded to the October 12 Letter on November 6, 2006. Sabert indicated that it considered the October 12 Letter a "charge of infringement," and expressed that Sabert believed that the sample did not infringe on the '542 Patent. (Wepner Decl. Ex. 6 (Letter dated November 6, 2006 from Sutton to Asmus) at 1.) On November 13, 2006, Sabert filed this action.

### III.   Reexamination Proceedings

Shortly after Sabert filed this action, Waddington filed a request for ex parte reexamination of the '542 Patent by the PTO. (Wepner Decl. Ex. 7 (Request for Ex Parte Reexamination Transmittal Form).) The request indicated that the reexamination was being sought based on information provided by Sabert. (Id. at 3-4.) The request stated Waddington's position on the matter and made amendments to all of the claims in the '542 Patent, including several of the independent claims. (Id. at 16-22.) Waddington also submitted two new claims to the PTO. (Id. at 22.)

On December 8, 2006, the PTO granted Waddington's request for reexamination. (Wepner Decl. Ex. 8 (Order Granting Request for Reexamination dated December 8, 2006).)

**IV.     Sabert's Complaint**

Sabert served its Complaint on Waddington on December 14, 2006. The Complaint included three counts. Count One requests declaratory judgment of patent non-infringement. Count Two requests declaratory judgment of patent invalidity. Count Three requests damages in the amount of $500,000.00.

## ANALYSIS

**I.     Justiciable Controversy**

The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Prior to the Supreme Court's decision in MedImmune, Inc. v. Genentech, Inc., --- U.S. ---- , 127 S. Ct. 764 (2007), the Federal Circuit applied, with regularity, the "reasonable apprehension" test to determine whether there was a judiciable controversy in the context of a putative infringer seeking declaratory relief in a suit against a patent owner. See BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed. Cir. 1993) ("There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity."); see Sierra Applied Sci., Inc. v. Advanced Energy Indus., Inc., 363 F.3d 1361, 1373 (Fed. Cir. 2004). In MedImmune, the Supreme Court expressed disapproval of the "reasonable apprehension" test.

In two recent cases, the Federal Circuit responded to MedImmune by significantly

altering, if not outright overruling, the "reasonable apprehension" test.  See Teva Pharmaceuticals USA, Inc. v. Novartis Pharmaceuticals Corp., 482 F.3d 1330 (Fed. Cir. 2007) ("By following MedImmune, we recognize that we are not relying on our two-part reasonable-apprehension-of-suit test."); see Sandisk Corp. v. STMicrolectronics NV, 480 F.3d 1372 (Fed. Cir. 2007) ("The Supreme Court opinion in MedImmune represents a rejection of our reasonable apprehension of suit test."); see Benitec Australia, Ltd. v. Nucleonics, Inc., --- F.3d ----, 2007 WL 2069646 (Fed. Cir. July 20, 2007).

As recognized by the Teva Court, MedImmune "re-affirmed that the 'actual controversy' requirement in the Declaratory Judgment Act is the same as the 'Cases' and 'Controversies' requirement in Article III."  Teva, 482 F.3d at 1339.

In Benitec Australia, Ltd. v. Nucleonics, Inc., the Federal Circuit highlighted its new approach to standing by quoting from the Teva decision:

> In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement, without some affirmative act by the patentee.  But Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do. . . .  We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise and the party need not risk a suit for infringement by engaging in the identified activity before seeking a declaration of its legal rights.

Sandisk Corp. v. STMicroelectronics, Inc., 480 F.3d 1372, 1380-81 (Fed. Cir. 2007).

## II.     Waddington's Arguments

### A.     Standing at the Time the Action was Filed

Waddington argues that no actual controversy exists which would give rise to jurisdiction over this matter because Waddington's action did not create a "reasonable apprehension" that Waddington would sue in the event that Sabert began to market its proposed product. While the parties argued this motion under the old standard, there is adequate information before this Court to make a determination on standing under the Federal Circuit's new test. At the time this action was filed, an actual controversy existed.

As set forth in <u>Teva</u>, "Article III jurisdiction may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he clams a right to do." Here, Waddington's communications with Sabert left Sabert with this choice. Sabert did not "merely" learn of Waddington's patent and perceive a risk of infringement. Sabert took steps, through multiple written communications, including providing a sample product, to obtain Waddington's position on whether the product Sabert intends to produce is violative of the '542 Patent. In response, Waddington has informed Sabert that the sample product appears to violate the '542 Patent. (<u>See</u> Wepner Decl. Ex. 5 at 1-2 ("[Waddington] will not provide authorization for your client to produce any products that rely on teachings from the ['542 Patent]. Based only on visual inspection, the new Sabert product appears to be vacuum metallized with stainless steel. If that observation is correct, then this article *clearly breaches* the ['542 Patent.]"(emphasis added)).)

It is true that Waddington took no affirmative action to stop Sabert from producing the metallized product line. The October 12 Letter, however, makes it plain that Waddington

considered the sample product violative of the '542 Patent. Further, Waddington undertook some analysis of the sample product, hired counsel to handle the communications with Sabert, and hired, but did not utilize, an expert to analyze Sabert's sample. The facts of this case fit the scenario set forth as the holding in Sandisk: "We hold only that where a patentee asserts rights under a patent based on certain identified ongoing or planned activity of another party, and where that party contends that it has the right to engage in the accused activity without license, an Article III case or controversy will arise . . . ." Sandisk, 480 F.3d at 1381. Sabert need not risk a suit of patent infringement if it is clear that Waddington will assert its right under the '542 Patent in the event that Sabert puts its product line onto the market. Standing existed at the time this suit was filed.[1]

---

[1] In Sandisk, the Court, in holding that a case or controversy existed, highlighted the following facts in the case: 1) the patentee, ST, provided a "thorough infringement analysis," 2) ST provided an element-by-element basis for infringement, and 3) the patentee liberally referred to the Sandisk product as the infringing product. The Court pointed out that these activities made clear that a "substantial controversy" existed between the parties.

Waddington argues that this case is distinguishable from Sandisk because of the lack of an in depth infringement analysis or a dearth of effort in comparing the product to the patent. This Court does not find this argument persuasive. Sandisk does not create a floor of analysis which must take place before a controversy exists. The amount of analysis that takes place is important, but not dispositve. The amount of analysis is only important insofar as it shows that a controversy exists.

This Court can conjure numerous situations where an actual controversy would exist following only a brief analysis of the product. Take, for instance, the design patent context, where a visual comparison of the patent to the alleged infringing product would allow the patentee to know its position on infringement.

Here, Sabert provided a sample and examples of the prior art. Waddington did not do an in depth analysis of the product, although it apparently intended to. But, Waddington took a clear position that if the product was made from stainless steel, and was not produced in a manner exactly the same as the prior art, then the product would be considered as infringing on the '542 Patent. This position, whether reached on observation or on a three hundred page report, is what creates the controversy.

### B.  Standing After the Request for Reexamination was Granted

Waddington argues that if a controversy existed at the time this action was filed, it no longer exists because Waddington has submitted the '542 Patent for reexamination. Waddington cites to no cases to support the position that a pending reexamination with the PTO affects standing in a declaratory judgment action. Neither could this Court locate any case law to support that notion.

Nothing in the motion papers indicates to this Court that the reexamination proceeding changes the parties' positions concerning the patent and the sample product, which is the basis for the controversy, in this case. At most, it provides reason to defer hearing the controversy to a later date. Further, the Federal Circuit has acknowledged that patent litigation in the district courts and PTO reexaminations are distinct procedures. See Ethicon, Inc. v. Quigg, 849 F.2d 1422, 1427 (Fed. Cir. 1988) ("[L]itigation and reexamination are distinct proceedings, with distinct parties, purposes, procedures, and outcomes."). Defendant's motion to dismiss based on lack of standing is denied.

### C.  The Court's Discretion to Assume Jurisdiction Under the Declaratory Judgment Act

Waddington argues that, even if an actual controversy exists, this Court should either 1) exercise its discretion under the Declaratory Judgment Act to decline to entertain the action, or 2) stay the proceeding until the resolution of the reexamination proceedings. Sabert argues that the reexamination proceeding will not change the disagreement between the parties, and will only prejudice Sabert further by delaying a disposition on the issue before this Court.

1. <u>Jurisdiction</u>

This Court may exercise its discretion in determining whether to assume jurisdiction, under the Declaratory Judgment Act, in patent cases. <u>Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.</u>, 846 F.2d 731, 735 n. 6 (Fed. Cir. 1988) ("There is no absolute right to a declaratory judgment. The Act says a court "may" grant one. . . . [W]hen there is a clear controversy . . . a district court's decision on whether to exercise that jurisdiction is discretionary."); <u>Serco Servs. Co. v. Kelley Co.</u>, 51 F.3d 1037, 1039 (Fed. Cir. 1995) ("even if a case satisfies the actual controversy requirement, there is no absolute right to a declaratory judgment"); <u>see</u> <u>also</u> <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 286-88 (1995) (holding, outside the patent context, that "the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants," and confirming that understanding). Waddington argues that this Court should not assume jurisdiction because 1) Waddington is willing to negotiate with Sabert, and 2) the '542 Patent has been subjected to reexamination.

This Court has jurisdiction. The matter is correctly before this Court. There was, and is, an actual controversy between the parties. The possibility of negotiation is not a sufficient reason to refuse jurisdiction. Negotiations may, as always, continue while a case is pending.

Nor, is the reexamination proceeding currently pending in the PTO a reason to refuse jurisdiction. As set forth above, a PTO reexamination is distinct from patent litigation. <u>See</u> <u>Ethicon, Inc. v. Quigg</u>, 849 F.2d 1422, 1427 (Fed. Cir. 1988). Thus, there is little risk of duplication of efforts. The only reason that the pending PTO reexamination might cause this Court to refuse jurisdiction is if the reexamination would moot the case. Nothing presented by

10

Waddington in this motion suggests that the reexamination would fully resolve the controversy in this matter. Absent that result, this Court is disinclined to take the extreme measure of declining to assert jurisdiction.

### 3. Stay of the Proceedings

Waddington argues that, in the event that this Court finds and asserts jurisdiction, as it has, it should stay the proceeding pending the outcome of the reexamination. Waddington persists that district courts have wide discretion. While the arguments for a stay are similar to those for a refusal of jurisdiction, this Court's analysis differs, as does the outcome.

"[D]istrict courts have broad discretionary powers to control their dockets, [and] stays will not be vacated unless they are 'immoderate or of an indefinite duration.'" Gould, 705 F.2d at 1341; see Ethicon Inc. v. Quigg, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988). A court is not required to stay a proceeding. Viskase Corp. v. Am. Nat'l Can Co., 261 F.3d 1316, 1328 (Fed. Cir. 2001). "One purpose of the reexamination procedure is to eliminate trial of that issue (when the claim is canceled) or to facilitate trial of that issue by providing the district court with the expert view of the PTO (when a claim survives the reexamination proceeding)." Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983).

There is little guidance from the Federal Circuit as to the factors a district court should consider when determining whether to stay a proceeding based on an ongoing reexamination proceeding. Thus, the factors considered by other district courts are instructive. The Southern and Northern Districts of California have noted that "[t]here is a liberal policy in favor of granting motions to stay proceedings pending the outcome of reexamination proceedings." Alltech, Inc. v. Cenzone Tech, Inc., 2007 WL 935516 (S.D. Cal. March 21, 2007) (quoting

11

ASCII Corp. v. STD Entertainment USA, Inc., 844 F. Supp. 1378, 1381 (N.D. Cal. 1994)). Stays are particularly appropriate when the reexamination result might assist the court in making a validity determination or would eliminate the need to make an infringement determination. Id. (citing In re Cygnus Telecommunications Tech., LLC Patent Litigation, 385 F. Supp. 2d 1022, 1023 (N.D. Cal. 2005). Some district courts have listed the following factors to determine whether a stay is appropriate:

> (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the nonmoving party; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether discovery is complete and whether a trial date has been set.

Alltech, 2007 WL 935516 at *2 (quoting Cygnus, 385 F. Supp. 2d at 1023); Xerox Corp. v. 3Com Corp., 69 F. Supp. 2d 404, 406 (W.D.N.Y. 1999); ASCII Corp. v. STD Entertainment USA, Inc., 844 F. Supp. 1378, 1380 (N.D. Cal. 1994) (citing GPAC, Inc. v. DWW Enterprises, Inc., 144 F.R.D. 60, 66 (D.N.J. 1992)). This Court is not bound by these factors, but will address them here, as they are instructive in making a determination on whether to enter the stay.

a. *Prejudice or Clear Tactical Disadvantage to Sabert*

Here, Sabert argues that any stay would prejudice their claim, specifically because the intent of the motion to stay is purely dilatory on the part of Waddington. This Court did not unearth any evidence to support the notion that Waddington's motivation in seeking reexamination is purely dilatory. Indeed, Defendant filed for reexamination before it was aware that Sabert filed suit. The correspondence between the parties also suggests that Waddington was not aware of the prior art brought to its attention by Sabert, and, therefore, further indicates a legitimate reason for Waddington to seek reexamination. (See Wepner Decl. Ex. 2 ("Prior to

12

receipt of your letter[, Waddington] had no knowledge of the Classy cutlery products[.]").)

Plaintiff's other argument regarding prejudice centers around the uncertainty it faces in its proposed business endeavor. In Plaintiff's estimation, until this case is resolved by the courts, it must face the uncertainty of potential infringement liability. Plaintiff is correct that this uncertainty is what the Declaratory Judgment Act was designed to address. See Arrowhead Industrial Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988).

This argument is far better suited, however, to address a court's possible refusal to exercise its discretion and assume jurisdiction. The stay, while adding time to the litigation, is a minimal expenditure of judicial economy for what might be an optimal efficiency gain. The reexamination period may produce information that narrows the issue before this court. Uncertainty abounds in every action of declaratory judgment in a patent case. Sabert posits nothing to lead this court to conclude that Sabert will suffer undue prejudice.

Further, Sabert, in its first letter, threatened to initiate reexamination. (Wepner Decl. Ex. 1 at 1.) Thus, it is unlikely that Sabert was not prepared, or caught unawares, by Waddington's tactic of resorting to the PTO for assistance in clarifying these issues.

      b.    *Simplifying the Issues*

As noted above, the reexamination might simplify the issues for this Court.[2] Waddington has amended all of its claims in the patent and added new claims in the reexamination proceeding. Thus, on all the claims in the '542 Patent, the PTO will make determinations. The

---

[2] This Court, in assuming jurisdiction, noted that the reexamination proceeding would not likely moot this action. The fine distinction between the possibility of resolving the controversy, and the possibility of refining the issues, is what leads this Court to maintain jurisdiction, but still entertain staying the proceedings.

determinations made by the PTO will provide expertise on the claims as they pertain to the prior art. GPA, Inc. v. D.W.W. Enterprises, Inc., 144 F.R.D. 60, 63 (D.N.J. 1992) ("Courts have emphasized the benefit of the PTO's expertise when issues relevant to prior art are involved."). Sabert makes no argument that the reexamination will further cloud the issues.

          c.     *Stage of the Litigation*

One of the most critical factors in determining whether to stay litigation pending the outcome of a reexamination proceeding is the stage of the litigation. Courts stress the importance of the stay being sought early in the litigation. See Tap Pharm. Prod., Inc. v. Atrix Labs., Inc., 70 U.S.P.Q. 2d 1319, 1320 (N.D. Ill. 2004) (noting, in granting the stay, that the case had not proceeded beyond the initial pleadings stage); see Snyder Seed Corp. v. Scrypton Sys., Inc., 52 U.S.P.Q. 2d 1221, 1223-24 (W.D.N.Y. 1999). Here, the parties have not yet entered the discovery phase of litigation. Pausing for a stay, at this point, is more advantageous than a later respite because the issues may be narrowed before discovery begins, allowing the parties to curtail their discovery activities. Requesting a stay early also decreases the likelihood of prejudice to the nonmoving party.

An examination of the circumstances surrounding this action advises that a stay of the proceedings is appropriate. The delay caused by the stay may prejudice Plaintiff. That prejudice is outweighed by the benefits that may be gained by awaiting the determination of the reexamination. The stay will likely narrow or clarify the issues before this Court. Finally, the stay has been requested early in the proceedings, which avoids any discovery or trial complications that might arise based on a later request. For these reasons, and those set forth above, Defendant's motion to stay this proceeding is granted.

**III.     Sabert's Damages Claim**

In Count Three of the Complaint, Sabert requests damages because of the delay in the production and sale of Sabert's proposed line of products caused by Waddington's assertion of the '542 Patent.  Waddington moves to dismiss Count Three, citing to B. Braun Medical, Inc. v. Abbot Laboratories, 124 F.3d 1419 (Fed. Cir. 1997) (holding that a request for damages in a declaratory judgment action "does not . . . result in an award of damages to the accused infringer.").  It appears that Sabert has abandoned this Count, as it did not argue against its dismissal.  Even if Sabert has not abandoned Count Three, this Court holds that Braun is dispositive.  Defendant's motion to dismiss is granted as to Count Three.

## CONCLUSION

For the reasons stated herein, Defendant's motion to dismiss based on standing is denied, Defendant's motion to stay this proceeding, pending the conclusion of the reexamination by the PTO, is granted, and Defendant's motion to dismiss Count Three is granted.

Dated: September 14, 2007

          S/Joseph A. Greenaway, Jr.
          JOSEPH A. GREENAWAY, JR., U.S.D.J.